**Charlotte WILLCOX, Administratrix of the Estate of David L. Willcox, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–14 V.

United States Claims Court.

Dec. 1, 1989.

Don W. Peck, Anderson, Ind., for petitioner.

No one appeared on behalf of respondent.

ORDER FOR ENTRY OF JUDGMENT

RADER, Judge.

The National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–1–300aa–34 (Supp. V 1987) (the Act), sets forth standards for compensating victims of mandatory vaccinations. The Act authorizes special masters to take evidence and recommend judgments to the United States Claims Court. On November 9, 1989, Special Master Hauptly filed a recommended judgment in favor of the parent of David L. Willcox, a child who died after administration of a diphtheria-pertussis-tetanus vaccine.

Neither party has filed an objection to the special master's recommended findings or conclusions of law. The time for filing objections has passed.

After review of the record, this court adopts the special master's Report and Recommendation of Judgment according to 42 U.S.C. § 300aa–12(d)(2). This court incorporates into its Order the special master's Report. Thus, the Report is attached and will appear as part of this Order.

It is ordered,

The Clerk of the Court shall enter judgment for petitioners in the amount of $280,000.00, consisting of $250,000.00 for the death of petitioner's son, David, and $30,000.00 for attorney fees and costs.

No additional costs.

## REPORT AND RECOMMENDATION OF JUDGMENT [1]

Filed November 9, 1989.

HAUPTLY, Special Master:

### 1. Introduction

This case concerns the eligibility of David L. Willcox, now deceased, (hereinafter David) for compensation under the National Childhood Vaccine Injury Act. David was born on October 28, 1946, in Jeffersonville, Kentucky, to Charlotte Willcox, petitioner and administratrix of the estate of her deceased son (hereinafter Petitioner). Petitioners' Submission Number 13 at 4 (hereinafter P.Sub.No. __). David Willcox died on January 29, 1952. P.Sub.No. 1 at 47. No hearing was held in this case. The respondent initially participated in this matter but on May 9, 1989, filed a notice of withdrawal. P.Sub.No. 20.

### 2. Requirements for eligibility

In order for petitioner to succeed in her claim for compensation, she must prove the following statutory requirements.

Section 2113(a)(1) of the Vaccine Act provides that compensation shall be awarded to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

In turn, under Section 2111(c)(1), a petitioner can establish entitlement to an award by demonstrating that the vaccine recipient in question—

(A) received a vaccine set forth in the Vaccine Injury Table ...,

(B) received the vaccine in the United States or in its trust territories,

(C) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) ..., and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

(D)(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in amount greater than $1,000, or (ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

### 3. Reception of the vaccine

David was inoculated with a vaccine listed in the Vaccine Injury Table (the DPT vaccine) on or about April 28, 1948.[2] David

---

1. This report may contain information that may not be disclosed to a nonparty. See 42 U.S.C. § 300aa-12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa-12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen (14) days period, then it shall be deemed that there is no material subject to § 300aa-12.

2. The administrator of the vaccination, a Dr. Hayes B. Threlkel, is now deceased. Dr. Threlkel's medical records have been destroyed to protect patient/physician confidentiality. P.Sub.No. 18. Counsel's attempt to obtain duplicate copies from Lourdes Hospital in Paducah, Kentucky, have proved to be equally fruitless. Id. However, the mother of the deceased, Mrs. Willcox, kept contemporaneous records. P.Sub.No. 10. These records indicate that David

received that vaccine in the United States. P.Sub.No. 1 at 7–8. The petitioner has proven the elements set forth in 42 U.S.C. § 300aa–11(c)(1)(A) and (B).

#### 4. Sustained a compensable injury within the prescribed time period

Within four (4) hours after receiving the vaccine, David began to display convulsive behavior. Among the symptoms observed by the petitioner were unconsolable crying, eyerolling, extremely pale coloration, convulsive shaking and a temperature measured at 104 degrees. The petitioner immediately attempted to contact the physician who had administered the DPT inoculation but was unsuccessful. P.Sub.No. 1.

The petitioner returned with David to the physicians' office the next day. In order to stop the shaking, seconal was prescribed. While David temporarily ceased to exhibit the convulsive behavior, he became hyperactive and suffered from periodic bouts of fever.[3]

In the meantime, the Willcox family moved to Cleveland, Ohio. Upon observing another convulsive episode, petitioner contacted the family physician, a Dr. Eugene Roach, who upon examination, had David admitted to University Hospital in Cleveland on April 13, 1950. *Id.* at 9.

At the hospital, the treating physician, Dr. Samuel Spector, surmised that David was suffering from a convulsive disorder, although he was unable to determine etiology of this malady. Dr. Spector prescribed phenobarbital[4] and asked that petitioner keep a daily log of her observations of David. *Id.* Petitioner was assisted in this endeavor by a private duty nurse. The material is contemporaneous and recorded long before the possibility of compensation had existed. Moreover, since it was compiled to assist in David's treatment, there

was every motivation to make it accurate. This material is relied on below.

42 U.S.C. § 300aa–14(b)(3)(A), Qualifications and Aids to Interpretation, lists bulging fontanel, convulsions and unconsolable crying as signs and symptoms of an encephalopathy. The entry on April 29, 1950, records a "child fretful and crying, ill-humored, observation of 5 bumps on forehead or enlargement in frontal area." *Id.* at 10. On May 19, 1950, the log records that seconal was administered after David began screaming and crying hysterically. *Id.* at 12.

On June 6, 1950, because of his deteriorating condition, David was hospitalized for 58 days. On August 21, 1950, petitioner jotted down this observation:

> After David's discharge on July 31, 1950, I observed his condition and it was substantially as it was prior to him being admitted, which was raised temperature, irritability, crying and convulsions. During this time we had many conversations with physicians and on August 21, 1950, David was readmitted to University Hospitals [*sic*] of Cleveland for the reason that his convulsions, hysterical crying, screaming, cold sweating, unstableness and incoherent speech were not under control. He was discharged on September 5, 1950, with a provisional diagnosis of convulsive disorder and possible *post encephalitis* (emphasis added). *Id.* at 13.

From that time forward, David was repeatedly admitted to the hospital due to unconsolable crying, convulsions, screaming and instability. Short periods of recovery were followed by remissions and hospitalization. Provisional diagnoses would invariably conclude that David was suffering from an encephalopathy and a convulsive disorder of undetermined etiology. *Id.* at 13–14.

---

received a DPT inoculation in the 19th month of his life.

**3.** A pattern developed wherein David would suffer from convulsions accompanied by a high fever. At least twice during these episodes, David fell backwards, striking his head against the floor. The only medication given to David

to ameliorate these conditions was seconal. *Ibid.* at 8.

**4.** *Dorland's Illustrated Medical Dictionary,* 27th ed. at p. 1274 describes phenobarbital as, "a long lasting barbiturate ...; used as a sedative, hypnotic and anticonvulsant."

On January 22, 1952, David was yet again brought to the hospital. Initially suffering from headaches and dizziness, he began to have convulsive episodes and then lapsed into a coma. A week later, on January 29, 1952, David died. The Certificate of Death lists the cause as acute hepatitis. Convulsion disorder was found to be a significant factor. P.Ex. No. 1 at 47.

The autopsy report states that the cause of death was acute hepatic necrosis or liver failure. The report links this liver failure directly to an anti-convulsant drug, sodium phethenylate. Sodium phethenylate was prescribed to ameliorate the seizures that were a direct result of David's DPT inoculation. Therefore, the liver failure was a sequela of the DPT vaccine. *Id.* at 239. Further, the autopsy report states that following the DPT vaccination, David developed post-inoculation encephalitis. *Id.* at 237. This finding is reiterated at *Id.* at 239. Petitioner relies on her observations and the autopsy report when she states in her affidavit at page 16 that:

> Prior to my son's death, the physicians advised me that the origin of the seizures had not been exactly determined; however, the autopsy report states that the death was due to toxic effects of the convulsion drug and *post inoculation encephalitis.* (Emphasis added.)

> We knew that David was a normal, healthy young boy with no medical problems prior to the administration of the DPT vaccine.

In addition, the record was reviewed by petitioner's medical expert, Dr. Martin B. Kleiman.[5] Based upon that review and a supplemental list of questions submitted by Dr. Kleiman to the petitioner, P.Sub.No.38, it is Dr. Kleiman's opinion that, to a reasonable degree of medical certainty, David suffered both an encephalopathy and seizure disorders due to the administration of the DPT vaccination. Further, it is Dr. Kleiman's opinion that David suffered the first

signs or symptoms of the encephalopathy within 24 hours after the DPT vaccine was administered. P.Sub.Nos. 28 and 40.

■ It is recognized that the fever recorded on or about April 28, 1948, of 104 degrees disqualifies the diagnosis of the seizure disorder as an on-table injury. *See* 42 U.S.C. § 300aa–14(b)(2)(B). Therefore, if David's singular injury were the seizure disorder, petitioner would not be entitled to a presumption of causation, but would be required to prove causation in fact.[6] However, since David's injuries and death were caused by both the seizure disorder and an encephalopathy, and the encephalopathy is entitled to the presumption of causation in that it satisfied the tabular requirements, the issue of causation in fact need not be considered. *See* 42 U.S.C. § 300aa–14(a)(I)(B). The record in this case, by a preponderance of the evidence, supports a finding that David L. Willcox suffered an encephalopathy as a result of a DPT inoculation and that condition resulted in his death.

It may be that a critical medical evaluation would disclose some other causation of David's condition. However, the respondent has chosen not to perform an evaluation or, at least, not to perform it in time for it to be of any use.

In addition, the records supplied by petitioner documents unreimbursed expenses of over $1,000, thus meeting the requirement of 42 U.S.C. § 300aa–11(c)(1)(D)(i). P.Sub.No. 17. Further, no prior settlement of a civil action has been collected for David's vaccine-related injury. Thus, the requirements of 42 U.S.C. § 300aa–11(c)(1)(E) are satisfied. P.Sub. Nos. 1, 18.

### 5. Alternative causation

The record is devoid of evidence that there was some other cause of David's injuries or death.

---

5. Dr. Kleiman is the Director of the Pediatric Infectious Disease Section in the Department of Pediatrics at the Indiana University School of Medicine in Indianapolis, Indiana. He received his medical degree from the State University of New York in 1968 and his written an extensive body of medical literature pertaining to pediatric neurological injuries. P.Sub.No. 28.

6. *See* H.R.Rep. No. 908, 99th Cong., 2nd Sess. *Reprinted* in 1986 U.S.Code Cong. & Admin. News pp. 6287, 6360.

### 6. Damages

Pursuant to 42 U.S.C. § 300aa–15(a)(2), in the event of a vaccine related death, compensation in the amount of $250,000 for the estate of the deceased is mandated.

### 7. Attorneys' fees and costs

■ In pre-Act cases, the Vaccine Act limits attorneys' fees, costs and pain and suffering to a maximum of $30,000. *See* 42 U.S.C. § 300aa–15(b) and the opinion in *Mikulich v. Secretary of Dept. of Health and Human Services* (88–2V) 18 Cl.Ct. 253, 259 (1989). This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is the "lodestar" model. *See Gregson v. Secretary of the Dept. of Health and Human Services*, No. 88–1V, Slip Op. at 7 (Cl.Ct.,April 24, 1989). The lodestar is the product of the reasonable hours expended multiplied by a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983).

The reasonable hourly rate is "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). In calculating the number of reasonable hours, those hours which reflect "excessive, redundant, otherwise unnecessary" hours are excluded from the compensable number of hours. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939.

It is obvious that the statutory limitation creates a difficult dilemma. In many of the petitions filed in this court, pain and suffering alone can reasonably be said to amount to more than $30,000. It is also equally clear that in certain prayers for relief, lost wages could also exceed that sum.

On the other hand, if attorneys' fees and costs are awarded first, the pool for pain and suffering and lost wages will be significantly diminished if not wiped out entirely.

For counsel to choose between the entitlement of their client and their fees creates an intolerable ethical conflict which counsel cannot properly resolve. The choice then is between underpaying or not paying counsel, on the one hand, and undercompensating the petitioner where the statute already limits petitioner to an amount short of full compensation, on the other hand. The choice should be made on the basis of which horn of the dilemma does the least harm to Congressional intent.

■ It seems clear to me that in permitting awards of attorneys' fees, barring counsel from collecting directly from the client, *See* 42 U.S.C. § 300aa–15(e)(3), and limiting the sum to one which would in many cases be too low, Congress must have intended that the fees and costs be paid first. The attorneys' fees provision is obviously intended to provide an incentive to counsel to take these cases. The choice of compensating counsel first, then, seems consistent with the intent of Congress. While under-compensation of petitioner in the capped areas is not pleasant, it is already contemplated by the statute's limitation. Thus, awarding the attorneys' fees first would not appear to violate Congressional intent in this area.

■ The attorney in this case has asked for $125 per hour for 227.75 hours for a total of $28,468.75. These fees are supported by affidavits from experienced practitioners in the area in which the attorney of record practices and in a related type of practice. P.Sub.No. 28. It is clear that the number of attorney hours submitted are reasonable and that duplicative hours have been carefully avoided. P.Sub.Nos. 28 and 39. Further, the costs submitted; amounting to $3,086.24 are reasonable. However, when fees and costs are totalled, the amount exceeds the statutorily mandated cap. *See* 42 U.S.C. § 300aa–15(b). Therefore, I recommend that the attorney of record be awarded the maximum payment allowed by the Act, or $30,000.

### PROPOSED FINDINGS

1. That the petition was timely filed.

2. That a preponderance of the evidence supports the conclusion that David L. Willcox suffered an encephalopathy within 72 hours of the administration of the DPT vaccine on or about April 28, 1948, and, as a sequela of that disorder died on January 29, 1952. The petitioner is thus entitled to compensation under the Act.

3. That unreimbursed expenditures have exceeded $1,000.

4. That there is not a preponderance of evidence that petitioner's death was due to factors unrelated to the administration of the vaccine.

5. The petitioner is the legal representatives of the estate of David L. Willcox.

6. There are no civil actions pending and no prior recovery has been made.

7. The statutory death compensation amount of $250,000 should be awarded in this case.

8. The maximum payment authorized by the statute for attorney's fees, costs, pain and suffering and lost income, is $30,-000. The maximum amount, for attorney's fees and costs alone, is appropriate in this case.

9. Judgment should be entered for petitioner in the amount of $280,000.